949 So.2d 1080 (2007)
Eddie Houston KEYS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-2012.
District Court of Appeal of Florida, Second District.
January 31, 2007.
Rehearing Denied March 12, 2007.
*1081 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Dale E. Tarpley, Assistant Attorney General, Tampa, for Appellee.
FULMER, Chief Judge.
Eddie Keys challenges the sufficiency of the evidence to sustain his convictions for trespass and possession of burglary tools. We reverse the conviction for trespass but affirm the conviction for possession of burglary tools.
Keys was charged with burglary of a dwelling and possession of burglary tools. The case proceeded to a jury trial. The jury returned guilty verdicts for trespass, as a lesser included offense of burglary, and the charged offense of possession of burglary tools. The court sentenced Keys to time served for trespass and ten years' imprisonment as a habitual offender for possession of burglary tools.
At trial, Susanna Cabrera testified that she lived across the street from a mobile home that had been vacant for the last couple of years. The home had a "For Sale" sign. On August 4, 2004, from her bedroom window, Cabrera noticed a man (later identified as Keys) going to the front of the home. Keys was taking the screens down from the front windows and putting them on the ground. Cabrera could not see the back of the mobile home from her vantage point. When asked if Keys went to the back of the home, Cabrera responded: "[He][w]ent to the other corner of the house. There's some small trees. He went to the other corner, but I didn't see nothing from the back."
Asked if she ever saw Keys try to enter through the front door, Cabrera replied that he opened the screen door and looked through, but he did not try to go through the door. Cabrera was asked whether, from her window, she could see if Keys had anything in his hands. She answered: "He had some kind of nails with tools in his hands buthe had something under his arm. I don't know whether it was a block, but he had something square." Cabrera acknowledged that she was not sure what exactly she saw in Keys' hands; "it could have been anything." As for the object under his arm, "It looked like some sort of brick orI mean, I wouldn't be able to tell you what it was." She stated that "[t]here was a pile of metal and stuff and trash right in front of the garbage. And he did went in there, in front of the garbage."
Victoria Ayala, Cabrera's sister-in-law, testified that on August 4, 2004, Cabrera called her attention to a man across the street. Ayala looked out the door and saw a man taking screens off the windows of the vacant mobile home. She recognized him as someone she knew, she gave his description when she called the police, and *1082 she identified Keys in court. Asked if she saw anything in his hands, she said:
Yeah, he was like using something metal to take the screens off the windows. And then he like, he lifted up one side of the stairs where the steps are and took something out from underneath the steps.
And he walked toward the end where there was like a pole beside the street. And it looked like he was going to throw it at the trailer, but he didn't throw it.
So I guess, because there was a car that came by, I guess when he seen it, he got scared or whatever, and just left.
Ayala testified that Keys never went inside the mobile home. The prosecutor asked:
So let'syou saw him remove some screens. What else did you see?
A. Basically, basically he never went inside. So basically all I seen was that he did take the screens off and that he, you know, walked around the back of it, and then he come back around, but that was it.
Q. But did it appear to you that he was trying to gain entry into this residence?
A. That's what it looked like. I don't know if he could have been doing something totally different, but that's the assumption I got.
Deputy Sheriff Hulverson received a description of a white male wearing blue sweat pants and a gray shirt, last seen walking. Responding to the location of the call, he saw Keys, who matched the description, walking in the rain about a block away. He was carrying a book and some deck spikes in his hands. The five deck spikes, introduced as State Exhibit 1, were nails approximately eight inches long and a quarter inch across; two of the five were slightly bent. Hulverson asked Keys if he could talk to him for a minute. Hulverson told him he matched the description of the subject that was seen at the residence, and Keys said he had been down the street looking at a house. That was where he had gotten the deck spikes. Hulverson asked if he would mind riding down there to make sure they were talking about the same house. Keys said that would not be a problem.
Detective Last testified that he drove to the scene to assist Deputy Sheriff Hulverson. When Last pulled up to the scene, Deputy Hulverson's patrol car was already parked in front. Almost all of the window screens had been removed, and each was neatly propped up against the side of the mobile home directly underneath the corresponding window. On the back door, Last noticed some pry marks between the door and the door jamb, where the metal meets the frame, right adjacent to the doorknob. Last said he could tell the pry marks were fresh "because there was no type of corrosion or anything, they were bright silver pry marks." Photographs of the door depicting the marks were introduced by the State.
Last read Keys his Miranda rights and interviewed him. Keys admitted to removing the screens; he said he was checking the home and making sure it was secure because he was interested in renting it. He told Last he knew it did not look right, but he was not trying to break into the house. As for the nails that were in his possession, he said he had found them at the rear of the residence.
Don Goodin, the owner of the mobile home, testified that he owns sixty to seventy homes, and his business is selling them. The property involved in this case had been vacant for some time. Asked if there was a "For Sale" sign in the yard on August 4, 2004, Goodin answered, "That date, I don't know, but there should have been one there. People keep taking them. *1083 So when they're gone, I put them back in, yes." Goodin did not know Keys, and Keys would not have had permission to be on the property, to take the screens off the windows, or to pry on the doors. The prosecutor asked, "Before this happened, was there any damage to the property?" Goodin replied, "Not to my knowledge."
On appeal, with regard to the conviction for possession of burglary tools, Keys argues that the State's witnesses did not see him prying on the back door of the house attempting to gain entry and his observed actions were equally consistent with vandalism or criminal mischief as they were with any intent to gain entry. Consequently, the conviction for possession of burglary tools cannot be sustained unless the circumstantial evidence excludes every reasonable hypothesis that the pry marks on the back door could have been made by someone else in the days and weeks prior to August 4, 2004. Keys contends that absent proof that the pry marks on the back door were made by him using the deck spikes he found in the yard, his conviction for possession of burglary tools cannot stand. The State responds that reasonable persons could conclude that Keys had the intent to gain entry into the mobile home and the fresh pry marks were evidence of the overt act.
In Thomas v. State, 531 So.2d 708, 709 (Fla.1988), the supreme court explained that the statute criminalizing possession of burglary tools "describes and prohibits a crime in the nature of an attempt." (Footnote omitted). "In effect, it criminalizes an attempt to commit a burglary or trespass, which is discerned through the possession of tools or devices coupled with the defendant's intent to use those tools in the commission of the crime." 531 So.2d at 709.
Where a person is accused of possessing "burglary" tools, the state must prove beyond every reasonable doubt not merely that the accused intended to commit a burglary or trespass while those tools were in his possession, but that the accused actually intended to use those tools to perpetrate the crime. The statute is specific on this point:
Whoever has in his possession any tool, machine, or implement with intent to use the same, or allow the same to be used, to commit any burglary or trespass shall be guilty of a felony of the third degree . . . .
§ 810.06, Fla. Stat. (emphasis added). Thus, the statute criminalizes the intent to use an item in an illegal way. Mere possession standing alone will not constitute a crime.
Id. The specific intent to commit a burglary or trespass using the tools in the defendant's possession "exists when he or she engages in or causes some overt act toward the commission of the burglary or trespass, which goes beyond merely thinking or talking about it." Id. at 710. When the evidence of the intent is circumstantial, the State must prove that the evidence is inconsistent with any reasonable hypothesis of innocence. Id. at 710 n. 2.
We agree with the State's assertion here that Keys exhibited behavior indicating an intent to gain entry into the mobile home and that it was reasonable to infer that Keys made the pry marks on the back door with the deck spikes. We also agree that Keys' explanation, that he was interested in renting the home and wanted to make sure it was secure, could be discounted as unreasonable and lacking credibility. We, therefore, conclude that the trial court did not err in denying the motion for judgment of acquittal.
With regard to the conviction for trespass, Keys asserts that he could not be convicted of trespass in a structure because *1084 the offense requires proof of entry, and the evidence affirmatively established that Keys did not enter the house. The State responds that Keys entered the airspace of the house when he removed the screens and when he inserted the deck spike into the door jamb.
We agree with Keys' assertion that the evidence does not demonstrate entry into the structure. We reject the State's argument that removal of the screens and attempting to pry open the door constituted entry. See J.B. v. State, 405 So.2d 247 (Fla. 3d DCA 1981). In J.B., the appellate court reversed a delinquency order based on a finding that the child was guilty of a trespass of a structure because the State had failed to prove entry into the structure. The court remanded for the trial court to reduce the trespass charge to attempted trespass. Id. at 248.
Attempted trespass is a category two permissive lesser included offense of trespass pursuant to the Schedule of Lesser Included Offenses in the Standard Jury Instructions (2004). Section 924.34, Florida Statutes (2004),[1] would authorize the reduction of the trespass to the attempt if the charge and proof are present. See I.T. v. State, 694 So.2d 720, 724 (Fla.1997) (section 924.34 refers to both category one necessary lesser included offenses and category two permissive lesser included offenses if the charge and proof are present). In this case, the burglary charge in the information does not include language to support the element of attempt, such that attempted trespass can be considered a permissive lesser here. Therefore, we reverse for discharge on the trespass conviction.
Affirmed in part, reversed in part, and remanded.
NORTHCUTT, J., and THREADGILL, EDWARD F., Senior Judge, Concur.
NOTES
[1] Section 924.34 provides:

When the appellate court determines that the evidence does not prove the offense for which the defendant was found guilty but does establish guilt of a lesser statutory degree of the offense or a lesser offense necessarily included in the offense charged, the appellate court shall reverse the judgment and direct the trial court to enter judgment for the lesser degree of the offense or for the lesser included offense.